IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| LOIS SMALL, | ) |
| | ) |
|      Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 2:10-00700-N |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
|      Defendant. | ) |

ORDER

Plaintiff  Lois Small filed this action seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner") that he was not entitled to disability insurance benefits  ("DIB")  under Titles II of the Social Security Act (the Act), 42 U.S.C.  §§ 401-433. (Tr. 119-122).  This action has been referred to the undersigned Magistrate Judge to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R.Civ.P. 73 (doc. 19) and pursuant to the consent of the parties (doc. 17).   Further, plaintiff's unopposed motion to waive oral arguments (doc. 21) was granted on August 31, 2011 (doc. 22).   Upon consideration of the  administrative record (doc. 12), and the parties' respective briefs (docs. 13, 14 and 15),  the undersigned concludes that the decision of the Commissioner is due to be **AFFIRMED**.

I. <u>Procedural History</u>.

Plaintiff, Lois Small, filed an application for SSI benefits on August 19, 2008, claiming an onset of disability as of June 27, 2008 (Tr. 119) due to diabetic neuropathy, bronchitis and high blood pressure (Tr. 155). Plaintiff's application was denied on September 22, 2008 (Tr. 63-69). A hearing before an Administrative Law Judge ("ALJ") was requested (Tr. 71)[1]. Following a hearing on February 3, 2010 (Tr. 38-62), the ALJ issued an unfavorable decision (Tr. 27-34). The ALJ determined that plaintiff was not disabled as defined in the Social Security Act (Tr. 34). Plaintiff requested a review by the Appeals Council (Tr. 23). Plaintiff's request for review was denied on September 9, 2010 (Tr. 20-22), thereby making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.981 (2009). Plaintiff appeals from that decision and all administrative remedies have been exhausted.

II. <u>Issue on Appeal</u>.

Plaintiff alleges that (1) the ALJ erred in ignoring the opinion of an examining physician; (2) the ALJ erred in rejecting the opinion of a treating physician; and (3) the ALJ erred in failing to properly apply the pain standard.[2]

---

[1] Plaintiff's application was processed pursuant to 20 C.F.R. §§ 404.906(b)(4), whereby after the initial determination, the reconsideration step in the administrative review process was eliminated, and the claimant could immediately request an administrative hearing. All references to the Code of Federal Regulations (C.F.R.) are to the 2010 edition.

[2] These issues will be addressed in reverse order inasmuch as the ALJ's credibility determination concerning plaintiff's pain foreshadows the other issues.

III.   Statement of Fact.

    A.    Plaintiff's written statements and testimony.

On August 27, 2008, plaintiff executed a "Function Report" in which she stated that, during a typical day, she gets up, brushes her teeth, baths, does routine exercises and walks, takes her insulin, makes breakfast (if she feels well enough), reads the Bible, and lays down on most days (Tr. 164).  Plaintiff also stated that she has difficulty sleeping and that getting in and out of the tub "is a challenge," but that she has no problem caring for her hair, shaving, feeding herself, or using the toilet (Tr. 165).  Plaintiff stated that she prepares meals "sometimes," makes her bed sometimes, and irons "a little bit" (Tr. 166).  According to the plaintiff, she goes outside daily (if she feels like it), walks and drives a car (sometimes) (Tr. 167).  She also shops in stores for food (when her body allows) and can handle her personal finances (Tr. 167).  Plaintiff also listens to the radio and reads the bible almost everyday (Tr. 168).  Plaintiff reported that she goes to church once or twice a month and regularly visits her parents' and sister's homes (Tr. 168).  She also reported that she could walk about ¾ mile before needing to stop and rest for five minutes (Tr. 169).  As to her ability to follow written and spoken instructions, plaintiff answered "O.K." (Tr. 169).  Plaintiff also stated that she handles both stress and changes in routine "well" (Tr. 170).

At the hearing before the ALJ, plaintiff testified that she was unable to work due to pain and numbness in her legs and feet, and back and hip pain (Tr. 44-45).  She rated her daily pain at level "8½" to "9" on a scale of "0" to "10" (Tr. 47).  She had to lie down 4-5 hours a day due to pain (Tr. 50).  Plaintiff also contended that her medication caused

3

side effects of drowsiness (Tr. 49).  Plaintiff further testified that her diabetes is "still

fully controlled." (Tr. 54).

Plaintiff  testified that she could not lift more than five pounds, sit for more than

two hours at a time, or stand for more than one hour at a time (Tr. 52-53).  She further

testified that she had difficulty bending and stooping and had occasional problems with

balance (Tr. 53).  Plaintiff stated that she swept a little, went grocery shopping, drove less

than 40 miles a week, and depended on family members for help with household chores

(Tr. 47- 48). She attended church one Sunday a month, sang in the choir, and visited with

"folks" at her home and outside her home (Tr. 48-49).

        B.     Medical evidence.

A nerve conduction study performed on the plaintiff on May 25, 2007, indicated

the presence of polyneuropathy "characterized by mild nerve conduction abnormalities"

(Tr. 208).  As a result of this study, Dr.Tomeka McPhillips dispensed to plaintiff

sufficient samples of Metanx to cover a two week period until her next appointment and

discussed with her "the importance of controlling blood sugar."  (Tr. 204).  Pursuant to a

referral from Dr. McPhillips, plaintiff was evaluated by Dr. Robert E. Engles, Jr. on June

6, 2007, for "bilateral swelling in her feet and ankles."  (Tr. 195).  A venous ultrasound

performed by Dr. Engles was "basically normal with no evidence of a deep venous

thrombosis or superficial venous insufficiency" and resulted in his instructions to plaintiff

"to elevate her legs frequently during the day and also use support stockings while she is

working."  (Tr. 202).

On June 8, 2007, plaintiff returned to Dr. McPhillips and reported that she "noticed a difference in the burning in her feet but she continues to have pain in her left leg and foot." (Tr. 201). Dr. McPhillips concluded that plaintiff's "condition is improving" and that her diabetes was "controlled." (*Id.*) Because the plaintiff reported that she "does not check her blood sugars," Dr. Phillips prescribed Lyrica in addition to the Matanx for plaintiff's leg pain and advised her to check her blood sugars which she had not been doing. (*Id.*)

On August 3, 2007, plaintiff returned again to Dr. McPhillips for a follow-up and refill of her Lyrica prescription. (Tr. 199). Plaintiff reported that she "really noticed how much the medicine helped after she ran out of it." (*Id.*) Plaintiff told Dr. McPhillips that her pain was decreased when taking the medicine but not completely gone away." (*Id.*) Consequently, Dr. McPhillips increased the Lyrica to "100 mg BID" and dispensed to the plaintiff samples of "neurodystonia to be used TID" until plaintiff returned to the clinic in four months. (*Id.*)

On August 27, 2007, plaintiff returned to Dr. McPhillips, was not wearing her compression socks as ordered by the doctor, and reported that she had not started taking the increased dose of Lyrica until "yesterday." (Tr. 198). Consequently, Dr. McPhillips updated her plan of care by instructing plaintiff that she "has to wear her compression socks daily" and "take Lyrica as prescribed." (*Id.*) Dr. McPhillips also authorized plaintiff to "take 5 days off work." (*Id.*)

Dr. Park T. Chittom began to see plaintiff in 1994. (Tr. 217). Plaintiff testified that she diabetic in 2004 (Tr. 43), but the date on which the diabetes was first diagnosed

is not evident in the records submitted by the plaintiff.[3]   When plaintiff presented herself on February 19, 2008,  her diabetes was found "poorly controlled" and she acknowledged that she was not eating properly.  (Tr. 226, 298).  Plaintiff also complained of "problems with her feet" and her peripheral neuropathy was noted.  (*Id*.)  Plaintiff was told to begin Actos and resume Lyrica.  (*Id*.)

On March 19, 2008,  although plaintiff's diabetes was still considered "poorly controlled," the medical notes indicate that plaintiff was "some better  [and] trying to eat partially correctly."  (Tr. 225) .  Plaintiff was given a prescription for Genuvia.  (*Id*.)

On April 4, 2008, Dr. Chittom commented not only that plaintiff's diabetes continued to be "poorly controlled," but that she "has been so out of control so long that when her blood sugar goes to 100 or to 110 she gets some symptoms."  (Tr. 224, 296). Dr. Chittom advised the plaintiff that she "would have to ride through this period of transition that her blood sugar had been so high so long and her body is accustomed to it

---

[3] A prescription for Glucovance first appears on 12/22/06 (Tr. 228) and the first actual mention of diabetes in Dr. Chittom's notes is in his 11/02/07 note when he states:

> This patient came in for a follow-up of her complaint of a rash all over her face and upper body and arms.  … It came on abruptly.  Has been started on lyrica not too long ago, peripheral neuropathy from diabetes.  Her diabetes has been poorly controlled. Her hemoglobin A1C is 10 today.  She says she is out of work and is moderately compliant with her medicines.  My suspicion is that the pain is not from the diabetes because she did feel the pinpricks.  It makes me wonder if we need to consider [sic].  We will re-check a B12 on her and stop lyrica in favor of topramax.  Encouraged her to exercise and lose weight.  And gave her some samples.

(Tr. 227).

and for her to get a blood sugar in a normal range it makes her feel like it is too low."
(*Id.*)  Dr. Chittom then commented that he believed plaintiff "is willing to do it."  (*Id.*)

At her next visit on May 2, 2008, Dr. Chittom found that plaintiff was "doing
pretty good" and "actually eating better [and] taking her medicines more correctly."  (Tr.
222, 294).  Dr. Chittom noted that plaintiff's diabetes was "improving."  and determined
to maintain her on Genuvia, Actos, Pamelor and Lyrica.  (*Id.*)

Plaintiff's next office visit on July 7, 2008, was for "chronic bronchitis with an
acute exacerbation and a mild asthmatic component."  (Tr. 221, 292).  The doctor's notes
indicate that plaintiff "has not been using her nebulizer" and "is still smoking."  (*Id.*)
Plaintiff also failed to get a prescription filled which had been called in for her and to
take her Actos. (*Id.*)   Plaintiff was not only told not to smoke and to get back on her
nebulizer but given antibiotics and mucinex.  (*Id.*)  At the follow-up visit on July 14,
2008, plaintiff was found to be "much better from a pulmonary stand point but her blood
sugar is not."  (Tr. 220, 291). Plaintiff's diabetes was again declared "poorly controlled"
and insulin was discussed.  (*Id.*)  Plaintiff told the doctor that she "will radically change
her diet" and "wants to take off the rest of the month" due to her peripheral neuropathy.
(*Id.*)  Dr. Chittom authorized plaintiff having four weeks off and said he would "see how
she does with the genuvia and glucovance."  (*Id.*)

On August 6, 2008, plaintiff was given "another month off" because her blood
sugar was sufficiently high and she was only "marginally compliant with her diet" to
require that she now take insulin.  (Tr. 219, 290).  Plaintiff's neuropathy was treated with
a continuation of the Lyrica and the addition of Pamelor.  (*Id.*)  On September 3, 2008,

plaintiff was found to be "doing better than usual" and her diabetes to be "improved, controlled." (Tr. 218, 289)   Plaintiff reported that her "legs still bother her a lot" and that, although "the lyrica has helped some," plaintiff told Dr. Chittom that the help was "not as much as she would like." (*Id*.)  Consequently, Dr, Chittom increased her Lyrica to "150 mg. bid" and decided to "see if she can tolerate it . . . [and] what it will do to help." (*Id*.)  Dr. Chittom also declared on September 3, 2008,  that plaintiff's "main complaint at this time was peripheral neuropathy" and that this condition "is not going to be well-controlled and I suspect will definitely contribute to her disability." (Tr. 217, 288).

When Dr. Chittom examined plaintiff on November 3, 2008, he noted that she was "[d]oing pretty well as far as the blood sugar goes but still has a lot of pain." (Tr. 287). He directed plaintiff to continue taking the Lyrica and the Pamelor and, in view of her complaint that "it makes her so sleepy," to take all three pills at bedtime. (*Id*.)

On January 26, 2009, Dr. Chittom concluded that plaintiff was "doing better" and that her diabetes was "better controlled." (Tr. 286).  He further observed that plaintiff "is more compliant" and "says her pain in her legs is better." (*Id*.)  Dr. Chittom also noted that, although plaintiff requested some Lortab, he told her "she did not need to take that" because her pain "is better." (*Id*.)   He did, however, note an intent to increase plaintiff's insulin to 53 units. (*Id*.)  Subsequently, however, on February 13, 2009, an order was

entered prescribing the insulin "as before."  (Tr. 285)[4].  Then, on February 26, 2009, plaintiff was given a prescription for  Lortab with no refills permitted (Tr. 285).

On April 20, 2009, plaintiff was again treated for bronchitis and no problems associated with her diabetes were noted. (Tr. 359).   On May 13, 2009, plaintiff's prescription for Lyrica was renewed (Tr. 358).  On August 11 and September 29, 2009, respectively, plaintiff was given a prescription for Tylenol #4.  (*Id*.).  On December 18, 2009, plaintiff called Dr. Chittom's office complaining of pain in her legs and was told to "up her nortriptylene to three at night" and continue taking her metanyx (Tr. 355).

On January 19, 2010, Dr. Chittom completed a Physical Capacities Evaluation on the plaintiff indicating that she could occasionally lift up to 10 pounds; occasionally carry up to 20 pounds; frequently use her hands for grasping, pushing and pulling arm controls and fine manipulation; sit for about 6 hours in an 8-hour workday;  stand for at least 2 hours and an 8-hour workday;  frequently use her feet for pushing and pulling of leg controls;  occasionally stoop and crouch but never kneel, crawl, climb, balance or reach overhead; unlimited exposure to vibrations but limited exposure to temperature extremes, noise, dust, humidity/wetness and fumes, odors, chemicals and gases.  (Tr. 364-66).

On February 15, 2010, Dr. Chittom wrote a letter on plaintiff's behalf  regarding her neuropathy and its resulting pain and therein confirmed that for several years plaintiff "has complained frequently and bitterly about the pain in her legs" and that the condition

---

[4] According to plaintiff's testimony at the hearing on February 3, 2010, she is taking the same amount she has always taken, namely 50 units.  (Tr. 54).

is caused by her diabetes.  (Tr. 369).   Dr. Chittom stated that "[w]e have tried to treat her as aggressively as we can but unfortunately she has not responded very well."  (*Id.* ). Although he then stated that "[t]his problem limits her a great deal," he did not explain in what specific manner her activities are limited or impose any restrictions that differ from those set forth in the  Physical Capacities Evaluation he completed on January 19, 2010. *Cf.* Tr. 364-66 and 369.  Finally, Dr. Chittom opined generally that this "difficult" problem of neuropathy "frequently result[s] in significant long-term irreversible disability."  (*Id.* ).

C.    Vocational expert's testimony.

At the outset of his testimony, the vocational expert ("VE") in this case, Dr. Patrick Sweeney, identified plaintiff's past relevant work of "sewing machine operator" as being light and semiskilled in nature, also identified as DOT 786.682-194 with an "SVP: 3."  (Tr. 56).  The ALJ then asked Dr. Sweeney to consider a hypothetical individual with the same vocational profile as the plaintiff and to factor in the functional limitations set forth by Dr. Chittom in his Physical Capacities Evaluation he completed on January 19, 2010 (Tr. 364-66).  Dr. Sweeney testified that such an individual could not go back to operating a sewing machine solely because the sewing machine operator is required to use the hands continuously and the hypothetical individual would only be permitted to use the hands "frequently."  (Tr. 57).

Dr. Sweeney did, however, identify three jobs that the hypothetical individual could perform.   The first was a "food checker" in a restaurant, cafeteria or other eating establishment which, according to Dr. Sweeney, is sedentary, semiskilled work with an

10

SVP: 3 and DOT number 211.482-014. (Tr. 57).  There are over a million such jobs in the national economy and over 5,000 in Alabama.  (*Id*.).

Another job identified by Dr. Sweeney was that of an "information clerk" which is classified a sedentary, semiskilled job with an SVP: 4 and DOT number 237.367-022. (Tr. 57).  There are about 120,000 such jobs in the national economy and 1,500 in Alabama.  (*Id*.).

The third job identified by Dr. Sweeney was that of a "receptionist" in an office setting, which is also sedentary and semiskilled with an SVP: 4 and DOT number 237.367-038.  (Tr. 57). There are over 100,000 such jobs in the national economy and 1,300 available in Alabama.  (*Id*.).

In addition to these semiskilled jobs, Dr. Sweeney also identified certain unskilled, sedentary jobs available. One such job was "final assembler" with an SVP: 2 and DOT number 713.687.018,  as to which there are 100,000 such jobs in the national economy and 1,500 in Alabama.  (Tr. 58).  Another job was identified as being "in an office setting" and sedentary, unskilled, with an SVP: 2 and DOT number 209.587-010, as to which there are 160,000 in the national economy and 990 in Alabama.  (*Id*.).  Another job was a "stuffer" who stuffs pillows or toys, identified as sedentary, unskilled with DOT number 731.685-014, as to which there are 200,000 such jobs in the national economy and 2,500 in Alabama.  (*Id*.).

The ALJ then asked Dr. Sweeney to consider the same hypothetical modified by the following nonexertional limitation:  "someone who can maintain attention persistence, concentration and pace during an eight hour work day or equivalent work

schedule [but] one-third or less of such a day based upon pain levels." (Tr. 58). Dr.
Sweeney testified that such a person could not do any of the six jobs he had previously
identified or any other job. Dr. Sweeney also testified that, if the ALJ finds all of
plaintiff's testimony to be credible, including that related to the pain in her legs and feet
due to peripheral neuropathy, plaintiff in his opinion could not work. (Tr. 59).

Plaintiff's counsel also asked Dr. Sweeney "how many [sick] days are allowable
by an employer before they terminate you?" (Tr. 61). Dr. Sweeney testified that, for an
unskilled job, "one to two days [per month] depending on the employer." (*Id*.). Dr.
Sweeney added that, "[t]hey might not make it through … a 90-day probationary period."

D.   Administrative Law Judge's Decision.

The ALJ found that Plaintiff had not engaged in substantial gainful activity since
her alleged onset date, June 27, 2008 (Tr. 29). The ALJ then found that Plaintiff had
severe impairments: Type II diabetes mellitus, peripheral neuropathy, tenosynovitis of
the right thumb, and hypertension, which "cause significant limitation in the claimant's
ability to perform basic work activities." (*Id*.).[5] These impairments, however, did not
meet or equal an impairment listed at 20 C.F.R. pt. 404, Subpart P, Appendix 1 (Tr. 30).
After considering the entire record, the ALJ concluded that Plaintiff has the residual
functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a), except

---

[5] The ALJ also discussed plaintiff's history of bronchitis and concluded that it was not
only directly related to her tobacco abuse, but did not amount to a "severe" impairment because,
unlike the other impairments, plaintiff's treating physicians have never indicated that bronchitis
caused any significant limitation in her ability to perform basic work activities. (Tr. 29).
Similarly, plaintiff's diagnosis on June 10, 2009, of chondromalacia of the left knee is not a
severe impairment under the regulations. (Tr. 30).

she is limited as set forth by Dr. Chittom in the Physical Capacities Evaluation  (Tr. 364-66) he completed on January 19, 2010.  (Tr. 30).   Finally, the ALJ concluded that although Plaintiff's residual functional capacity precluded her from performing her past relevant work (Tr. 32-33), she is capable of performing work that exists in significant numbers in the national economy (Tr. 33).  Thus, the ALJ found that Plaintiff was not disabled within the meaning of the Act (Tr. 34).

Although the ALJ found that plaintiff's impairments "could reasonably be expected to cause some of the alleged  symptoms," he found that her testimony about the intensity, persistence and limiting effect of those symptoms was not credible "to the extent they are inconsistent with the [ALJ's] residual functional capacity assessment," which was based upon Dr. Chittom's Physical Capacities Evaluation (Tr. 364-66) of January 19, 2010.  (Tr. 31). The ALJ specifically concluded that neither the plaintiff's statements  nor the medical records support the frequency or severity of the alleged pain or the functional limitations claimed.  The ALJ did credit plaintiff's testimony regarding the medication side effects, but concluded that the drowsiness she had experienced was relieved when, upon her doctor's instructions, she began taking the medication at bedtime. (*Id*.).

The ALJ also discounted plaintiff's testimony at the hearing about the marked restrictions in her daily activities in light of the written report she submitted previously in support of her disability application.  (*Id*.).   The ALJ specifically found as follows:

> In fact, a written report provided by the claimant to the Social Security Administration reveals that she engages in more daily activities than she testified.  The claimant reported that she independently cares for her

> personal needs, exercises and walks, prepares her meals, makes her bed,
> irons for 30 to 60 minutes, drives, grocery shops, attends church 1 to 2
> times a month, and visits family members.  She said she is able to walk
> three-quarters of a mile (Exhibit 3E [Tr. 164-171]).

(Tr. 31).  The ALJ also found that, according to her medical records, plaintiff has "no
neurological deficits, muscle atrophy nor significant weight loss, generally associated
with protracted prolonged pain at a severe level [and] . . . no medical evidence to support
[her] contention that she has to recline a majority of the day due to pain."  (*Id*.).   The
ALJ also noted that plaintiff's diabetes is "currently controlled with insulin. . . . [and] [a]
nerve conduction study performed on May 25, 2007, shows mildly abnormal findings
suggestive of polyneuropathy."  (Tr. 32, *citing* Tr. 208 and 357). The ALJ also found that
plaintiff's testimony was inconsistent with the medical records that demonstrate that her
neuropathy pain and lower extremity swelling did respond to the Lyrica prescribed by her
physicians.  (Tr. 32;  *see also* Tr. 286, 289 and 357).

Although the ALJ discounted Dr. Chittom's statement of February 15, 2010, as
"not supported by the clinical evidence or his own treatment notes,"  the ALJ "afforded
great weight" to Dr. Chittom's physical capacities assessment of January 19, 2010,
because it was "well supported by the objective medical evidence, including his treatment
notes."  (Tr. 32).  The ALJ specifically found that Dr. Chittom's assessment of January
19th, 2010, "is the most accurate" and, therefore, adopted it "as the claimant's physical
residual functional capacity."  (*Id*.).  The ALJ further found that there "is no evidence to
support a finding of significant mental limitation due to a mental impairment or pain."
(*Id*.).

Based upon the aforementioned physical residual functional capacity and the testimony of the vocational expert, the ALJ held that plaintiff could not perform her past relevant work as a sewing machine operator but that she "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (Tr. 33-34).  Consequently, the ALJ held that plaintiff was "not disabled." (Tr. 34).

IV.  Conclusions of Law.

    A.    Standard of Review.

In reviewing claims brought under the Act, this Court's role is a limited one. Specifically, the Court's review is limited to determining: 1) whether the decision is supported by substantial evidence, and 2) whether the correct legal standards were applied. *See*, 42 U.S.C. §  405(g); Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).  Thus, a court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996);  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  Rather, the Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Chater, 84 F.3d at 1400;  Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991).  *See also*, Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990)("Even if the evidence preponderates against the Secretary's factual findings, we must affirm if the decision reached is supported by substantial evidence.");  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir.  1983) (finding that substantial evidence is

defined as "more than a scintilla but less than a preponderance," and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[ ]"). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. Lynch v. Astrue, 358 Fed.Appx. 83, 86 (11th Cir. 2009); Martino v. Barnhart, 2002 WL 32881075, * 1 (11th Cir. 2002); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).

      B.    Analysis.

1.    The ALJ properly applied the pain standard.

The pain standard established by the Eleventh Circuit requires "(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995), quoting Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991). "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." Foote, 67 F.3d at 1562, citing MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986). "If proof of disability is based upon subjective evidence and a credibility determination is, therefore, critical to the decision, 'the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding' ." Werner v. Commissioner of Social Security, 421 Fed. Appx. 935, 938 (11th Cir. Mar. 21, 2011), quoting Foote , 67 F.3d at 1562. See also

Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983) (ALJ did not specifically address testimony by claimant and her daughter about claimant's pain).  According to the Eleventh Circuit, "[t]he question is not . . . whether ALJ could have reasonably credited [claimant's] testimony, but whether the ALJ was clearly wrong to discredit it."  Werner, 421 Fed. Appx. at 939. Explicit credibility findings are "necessary and crucial where subjective pain is an issue."  Foote, 67 F.3d at 1562, *quoting* Walden v. Schweiker, 672 F.2d 835, 839 (11th Cir. 1982).

In this case, the ALJ did find that plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms." (Tr. 31).  The ALJ also found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible."  (*Id*.).  The ALJ explicitly discredited plaintiff's testimony concerning the alleged debilitating effect of her pain. The ALJ's finding was based in part on the objective clinical evidence.  (*Id*.).  For example, plaintiff testified that, because of her pain, she could not lift more than 5 pounds, sit more than two hours without interruption and stand more than one hour at a time.  (Tr. 52-53).   However, Dr. Chittom's examinations from October 2006 to October 2009 consistently showed normal muscular strength, reflexes, sensation, and gait, no spinal tenderness, and normal range of motion (Tr. 218-19, 221-22, 224-26, 230, 286, 287-98, 357, 359).   Additionally, Dr. Chittom opined on January 19, 2010, that plaintiff could occasionally lift up to 10 pounds; occasionally carry up to 20 pounds; stand and/or walk at least 2 hours in an 8-hour workday with normal breaks; and sit about 6 hours in an 8-hour workday with normal breaks. (Tr. 364-66).

The ALJ also considered plaintiff's allegation that her medications caused drowsiness, a complaint found credible by the ALJ. (Tr. 31).  The ALJ noted, however, that plaintiff's medications are now taken at bedtime "and do not interfere with her daily functioning." (*Id.*).    The ALJ specifically stated:

> On January 26, 2009, the claimant reported medication side effect of drowsiness to her treating physician, Dr. Park Chittom.  He told her to start taking the medications at bedtime (Exhibit 6F, pg. 5 [Tr. 287]).  She has not complained to Dr. Chittom of medication side effects since that time.

(Tr. 31).   In addition, the ALJ found that "claimant's testimony as to marked restriction in her daily activities remains uncorroborated." (*Id.*).  Although plaintiff argues that her Function Report "contains limitations very similar to those [she] expressed . . . at her hearing,"  the Report is not actually inconsistent with the ALJ's finding that plaintiff "independently cares for her personal needs, exercises and walks, prepares her meals, makes her bed, irons for 30 to 60 minutes, drives, grocery shops, attends church 1 to 2 times a month, and visits family members [and] is able to walk three-quarters of a mile." *Cf.* Tr. 31 and Tr. 164-169.

Plaintiff takes issue (doc. 13 at 8) with the ALJ's finding that her "neuropathic pain and lower extremity swelling  responded to treatment with Lyrica" (Tr. 32). Plaintiff concedes  (doc. 13 at 9), however, that on January 26, 2009, she told Dr. Chittom that her pain in her legs was better and that, consequently, Dr. Chittom told her she did not need Lortab for pain (Tr. 286).   Plaintiff argues that "this one note does not outweigh the remainder of his treatment records, which show continued pain and swelling and continued prescriptions for Lyrica and pain medication." (Doc. 13 at 9).

18

Plaintiff's contention is, however, without merit.  Plaintiff's medical records contain only

nine additional treatment notes by Dr. Chittom, summarized as follows:

> 2-13-09:  renewing plaintiff's prescriptions for insulin and Glucovance (Tr. 285)
> 2-26-09:  prescription for Lortab with no refills (Tr. 285)
> 5-13-09:  renewing plaintiff's prescriptions for Lyrica (Tr. 358)
> 4-20-09:  chief complaints of cough/wheezes and painful trigger finger (Tr. 359)[6]
> 8-11-09:  prescription for Tylenol # 4 with no refills (Tr. 358)
> 9-29-09:  renewing prescription for Tylenol # 4 with no refills (Tr. 358)
> 10-09-09:  "peripheral neuropathy is still symptomatic *but not quite as bad*."
>       (Tr.357, emphasis added)
> 10-21-09: Mammogram (Tr. 351-52)
> 11-12-09: renewing prescription for Tylenol # 4 (Tr. 356).

Contrary to plaintiff's contentions[7], Dr. Chittom's records do not contradict the ALJ's

findings.  Not only did Dr. Chittom note on January 26, 2009, that plaintiff's neuropathy

was responding to treatment, but again on October 9, 2009, when he noted as follows:

> [Plaintiff's] peripheral neuropathy is still symptomatic *but not quite as bad*.  She
> is on her lyrica.  Actually she is much more stable than she has been for awhile.
> She is taking Tylenol # 4 and ziac along with her other medicines.  . . . Told her
> her blood sugar is doing great.

(Tr. 357, emphasis added).  It is also important to note that, on January 19, 2010, a date

following all of these treatment notes relied upon by the plaintiff, that Dr, Chittom

completed his Physical Capacities Evaluation Form and therein stated that the plaintiff

could occasionally lift up to 10 pounds; occasionally carry up to 20 pounds; frequently

use her hands for grasping, pushing and pulling arm controls and fine manipulation; sit

for about 6 hours in an 8-hour workday;  stand for at least 2 hours and an 8-hour

---

[6] Plaintiff was referred to Dr. H. John Park who examined her on June 10, 2009 (Tr. 361).

[7] The notes following Dr. Chittom's January 26, 2009 not never mention a complaint
regarding any complaint of "swelling".

workday;  frequently use her feet for pushing and pulling of leg controls;  occasionally

stoop and crouch but never kneel, crawl, climb, balance or reach overhead; unlimited

exposure to vibrations but limited exposure to temperature extremes, noise, dust,

humidity/wetness and fumes, odors, chemicals and gases.  (Tr. 364-366). [8]

Consequently, the ALJ properly discredited plaintiff's pain testimony and properly

applied the restrictions set forth by Dr. Chittom, plaintiff's long-term treating physician,

on January 19, 2010.  This case is, therefore, distinguishable from Carr v. McMahon, 481

F.Supp.2d 1227,  1231-32 (N.D. Ala. 2007), in which the ALJ not only rejected the

claimant's subjective complaints of pain but the treating physician's opinion regarding

claimant's residual functional capacity, including her ability to only sit for 30 minutes,

stand for 15 minutes, and walk for 30 minutes at any one time; to stand for only one hour

and sit for only one hour in an 8-hour workday; and the likelihood that she could be

expected to miss three or more days per month of work.

Plaintiff also relies (doc. 13 at 9) on an excerpt from Lewis v. Callahan, 125 F.3d

1436, 1441 (11th Cir. 1997), in which the Eleventh Circuit stated that it did not believe

that "participation in everyday activities of short duration, such as housework or fishing,

disqualifies a claimant from disability."  The Eleventh Circuit actually stated in full: "Nor

do we believe that participation in everyday activities of short duration, such as

---

[8] In contrast to his January 19, 2010 Physical Capacities Evaluation Form which is supported by plaintiff's medical records and treatment notes, Dr. Chittom's February 15, 2010 is not supported by any treatment notes and fails to either explain in what specific manner plaintiff's activities are limited or to impose any restrictions that differ from those set forth in the previous January 19, 2010 evaluation.  Cf. Tr. 369 and Tr. 364-366.

housework or fishing, disqualifies a claimant from disability *or is inconsistent with the limitations recommended by Lewis's treating physicians*." 125 F.3d at 1441 (emphasis added).   The ALJ in this case has not held that plaintiff's participation in certain activities of daily living are inconsistent with Dr. Chittom's Physical Capacities Evaluation of January 19, 2010, the evaluation which is consistent with his treatment notes.  Plaintiff's activities of daily living are, in fact, consistent with the only limitations specifically imposed by Dr. Chittom.[9]

Plaintiff's medical records also make clear that her improvements correlate with her improved control of her diabetes.  It is well established that "[a] medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling." Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) (*quoting* Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987) (footnote omitted)).   The record establishes that plaintiff's diabetes is now better controlled and that her peripheral neuropathy is responding to treatment.  The ALJ's opinion is not at odds, therefore, with Bennett v. Barnhart, 288 F.Supp2d 1246, 1252 (N.D. Ala. 2003), in which the court held that "[i]t is the ability to engage in gainful employment that is the key, not whether a plaintiff can perform minor household chores or drive short distances."  As stated above, the ALJ applied the limitations imposed by plaintiff's treating physician on January 19, 2010, and held, pursuant to the testimony of a vocational expert, Dr. Sweeney, that "there are jobs

---

[9] Nor is plaintiff's reliance on Flynn v. Heckler, 768 F.2d 1273, 1275 (11th Cir. 1985), appropriate.  Unlike the ALJ in Flynn, the ALJ in the case at bar has held that plaintiff's type II diabetes, peripheral neuropathy and hypertension are severe impairments which "cause significant limitation in claimant's ability to perform basic work activities."  (Tr. 29).

that exist in significant numbers in the national economy that claimant can perform." (Tr.

33). *See* Hurtado v. Astrue, 2011 WL 1560654,  1 (11th Cir. Apr. 25, 2011)("At the fifth

step of the sequential process, an ALJ may rely solely on the testimony of a VE in

determining whether work is available in significant numbers in the national economy

that a claimant is able to perform.").

The ALJ in this case, properly concluded that plaintiff's "statements concerning

the intensity, persistence and limiting effects" of her pain were "not credible to the extent

they are inconsistent with [Dr. Chittom's January 19, 2010] residual functional capacity

assessment." (Tr. 31).  The ALJ documented clearly his reasons for this determination.

Plaintiff's contentions to the contrary are without merit.

> 2.    The ALJ properly applied Dr. Chittom's Physical Capacities Evaluation
>        Dated January 19, 2010.

As set forth above and conceded by the plaintiff (doc. 13 at 5), the ALJ adopted

the physical limitations cited by Dr. Chittom in his  Physical Capacities Evaluation dated

January 19, 2010.  The ALJ did reject Dr. Chittom's subsequent opinion dated February

15, 2010, because this opinion "is not supported by the clinical evidence or his own

treatment notes." (Tr. 32).  For the reasons stated above, the ALJ did not err in his

decision.  Plaintiffs contention that "Dr. Chittom's records contain numerous reports that

her diabetes is uncontrolled or poorly controlled and the pain in her feet and legs

resulting from the diabetic neuropathy continued, despite increasing dosages of insulin,

Lyrica and the addition of Pamelor" is without merit.  The records referred to by the

plaintiff preceded the treatment records which indicate improved control of her diabetes

and that her pain was responding to treatment.  In addition, Dr. Chittom's January 19, 2010 Physical Capacities Evaluation followed those treatment notes which demonstrated plaintiff's improved condition while no treatment notes to the contrary exist prior to his February 15, 2010 letter, a letter which fails to impose any specific limitations which differ from those previously imposed on January 19, 2010.

It is well established that the ALJ must evaluate every medical opinion he receives. 20 C.F.R. § 404.1527(d). In deciding how much weight to give a medical opinion, the ALJ considers the following factors:

> • The examining relationship between the individual and the "acceptable medical source";
>
> • The treatment relationship between the individual and a treating source, including its length, nature, and extent as well as frequency of examination;
>
> • The degree to which the "acceptable medical source" presents an explanation and relevant evidence to support an opinion, particularly medical signs and laboratory findings;
>
> • How consistent the medical opinion is with the record as a whole;
>
> • Whether the opinion is from an "acceptable medical source" who is a specialist and is about medical issues related to his or her area of specialty; and
>
> • Any other factors brought to our attention, or of which we are aware, which tend to support or contradict the opinion.

Social Security Ruling (SSR) 06-03p, available at 2006 WL 2329939, at *3. "[W]hen other evidence in the record supports a conclusion contrary to the opinion of an examining physician, the [Commissioner's] regulations allow the ALJ to reject the opinion of the examining physician." Warncke v. Harris, 619 F.2d 412, 417 (5th Cir.

1980).  *See also* <u>Marbury v. Sullivan</u>, 957 F.2d 837, 840 (11th Cir. 1992)("An ALJ sitting

as a hearing officer abuses his discretion when he substitutes his own uninformed

medical evaluations for those of a claimant's treating physicians: 'Absent a good showing

of cause to the contrary, the opinions of treating physicians must be accorded substantial

or considerable weight by the Secretary'."), *quoting* <u>Lamb v. Bowen</u>, 847 F.2d 698, 703

(11th Cir. 1988).   As applied to this case, the ALJ properly accorded substantial weight to

Dr. Chittom's January 19, 2010 opinion, while rejecting the conclusory, unsupported

opinion of February 15, 2010 .

> 3.   <u>The ALJ properly ignored the opinion of Dr. Robert E. Engles, Jr.
> Dated June 6, 2007</u>.

Plaintiff essentially complains that "Dr. Engles instructed [plaintiff] to elevate her

legs frequently during the day [and] the ALJ did not include this requirement in his RFC

assessment or his hypothetical questions to the vocational expert."  (Doc. 13 at 5, *citing*

Tr. 195, 202-203).   Dr. Engles evaluated plaintiff for "bilateral swelling in her feet and

ankles."  (Tr. 195).   After performing an ultrasound which was "basically normal," Dr.

Engles not only recommended that she elevate her legs frequently during the day but that

she "use support stockings ***while at work***."  (Tr. 195, emphasis added).   Consequently,

Dr. Engles was not imposing any limitation upon plaintiff's ability to work and did not

provide a definition for the term "frequently" as used in this matter.  In addition,  the

medical records are devoid of any further reference to a "swelling" complaint which

would in any way impact Dr. Chittom's opinion dated January 19, 2011.

<u>CONCLUSION</u>

For the reasons stated above, the undersigned finds there is substantial evidence supporting the Commissioner's decision. Accordingly, it is **ORDERED** that the decision of the Commissioner denying plaintiff's application for DIB benefits  is hereby **AFFIRMED**.

**DONE** this  19<u>th</u> day of   September, 2011.

<u>/s/ Katherine P. Nelson</u>
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**